# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.              No. CR 23-1164 JB

SCOTT GARMAN,

   Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress, filed December 16, 2024 (Doc. 49)("Motion to Suppress"). The Court held evidentiary hearings on March 6, 2025, March 17, 2025, and April 8, 2025. See Clerk's Minutes at 1, filed March 6, 2025 (Doc. 68)("March 6, 2025, Hearing Minutes"); Clerk's Minutes at 1, filed March 17, 2025 (Doc. 70)("March 17, 2025, Hearing Minutes"); Clerk's Minutes at 1, filed April 8, 2025 (Doc. 74)("April 8, 2025, Hearing Minutes"). The primary issues are: (i) whether the New Mexico Corrections Department ("Corrections Department") Security Threat Intelligence Unit ("STIU") officers violate the Fourth Amendment of the Constitution of the United States when they search Alexis Garcia's apartment after arresting Defendant Scott Garman in Garcia's apartment where: (a) Garman's probation terms permit STIU officers to search his living quarters without a warrant; (b) a confidential informant tells STIU Officer Dirk Bonsemeyer that Garman is living at Garcia's apartment, is likely armed with firearms, and is using drugs; and (c) STIU Officer Joshua Giacci observes in plain view drug paraphernalia when he enters the apartment to arrest Garman; (ii) whether, if there is a Fourth Amendment violation, the inevitable discovery exception applies, where the STIU officers have probable cause to search Garcia's apartment before conducting the probation search; and (iii) whether a search warrant that the Bernalillo County Sheriff's Office

execute after the probation search is defective, where Garman alleges that the magistrate judge who signs the search warrant is biased against him, based on their previous contentious attorney-client relationship.  The Court concludes: (i) there is no Fourth Amendment violation, because the Corrections Department officers have reasonable suspicion that Garman is violating his State probation terms, and Garman is notice that he has standard probation conditions, including the condition which permits STIU officers to search his living quarters without a warrant; (ii) even if there is a Fourth Amendment violation, the inevitable discovery exception applies, because law enforcement officers would have obtained a search warrant and discovered the challenged evidence, even if they had not conducted the probation search; and (iii) the search warrant is valid, because the magistrate judge who signs the warrant is neutral and detached.  Accordingly, the Court denies the Motion to Suppress.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d)'s purposes.  The Court makes these findings under rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other Federal Rules of Evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a)("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider

hearsay in ruling on a motion to suppress.  Additionally, the United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements.  See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[1]("[T]he Supreme Court has made it clear hearsay is admissible in suppression hearings . . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); and United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).

## FINDINGS OF FACT

1.    On January 22, 2020, Garman signs probation compliance forms for three State court cases: (i) State of New Mexico v. Garman, Case No. D-202-CR-2019-343 (County of Bernalillo, Second Judicial District, State of New Mexico)("343 Case"); (ii) State of New Mexico v. Garman, Case No. D-202-CR-2019-699 (County of Bernalillo, Second Judicial District, State

---

[1]United States v. Lopez-Carillo, 536 F. App'x 762 (10th Cir. 2013), is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Lopez-Carillo; United States v. Collins, 461 F. App'x 807 (10th Cir. 2012), United States v. Kennedy, 106 F. App'x 688 (10th Cir. 2004); United States v. Blake, 284 F. App'x 530 (10th Cir. 2008); United States v. Stewart, 273 F. App'x 768 (10th Cir. 2008); United States v. Reed, 195 F. App'x 815, (10th Cir. 2006); United States v. Wilson, 96 F. App'x 640 (10th Cir. 2004); United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005), and United States v. Guthrie, 184 F. App'x 804, (10th Cir. 2006); have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

of New Mexico)("699 Case"); (iii) <u>State of New Mexico v. Garman</u>, Case No. D-202-CR-2019-1675 (County of Bernalillo, Second Judicial District, State of New Mexico)("1675 Case").  .  <u>See</u> Probation Compliance Forms at 1-11 (dated January 22, 2020), admitted as United States Exhibit 2 at Suppression Hearing on March 6, 2025 ("Probation Compliance Forms"); United States' Response to Defendant's Motion to Suppress at 1-2, filed January 6, 2025 (Doc. 55)("Motion to Suppress Response"); Closing Argument in Support of Motion to Suppress at 9-11, filed May 10, 2025 (Doc. 77)("Garman Closing Arguments"); United States' Written Closing Argument Re: Defendant's Motion to Suppress, Evidentiary Hearing at 2-3, filed June 2, 2025 (Doc. 78)("United States Closing Arguments").

2.      The Probation Compliance Forms list fifteen "standard conditions," including: (i) "I will permit a warrant-less search by the [Probation/Parole] Officer of my person, automobile, residence, property and/or living quarters if he/she has reasonable cause to believe the search will produce evidence of a violation of my conditions of probation"; (ii) "I will not buy, sell, own, or have in my possession, at any time, firearms, ammunition, or other deadly weapons"; and (iii) "I will not buy, sell, consume, possess or distribute any controlled substances except those legally prescribed for my use by a State Certified Medical Doctor."  Probation Compliance Forms at 6-7.

3.      On October 8, 2020, the Honorable Michael E. Martinez, District Judge for the County of Bernalillo, Second Judicial District, State of New Mexico, revokes Garman's probation in three State court cases: (i) <u>State of New Mexico v. Garman</u>, Case No. D-202-CR-2019-343 (County of Bernalillo, Second Judicial District, State of New Mexico)("343 Case"); (ii) <u>State of New Mexico v. Garman</u>, Case No. D-202-CR-2019-699 (County of Bernalillo, Second Judicial District, State of New Mexico)("699 Case"); (iii) <u>State of New Mexico v. Garman</u>, Case No. D-202-CR-2019-1675 (County of Bernalillo, Second Judicial District, State of New Mexico)("1675 Case").  <u>See</u> Garman Closing Arguments at 2; <u>State of New Mexico v. Garman</u>, Case Nos. D-202-

- 4 -

CR-2019-343, D-202-CR-2019-699, D-202-CR-2019-1675, Order Revoking Probation at 1 (dated October 8, 2020)(County of Bernalillo, Second Judicial District, State of New Mexico, filed October 21, 2020)(admitted as Defense Exhibit A at Suppression Hearing on March 6, 2025)("Revocation Order").

4.      Judge Martinez sentences Garman to 325 days of incarceration for violating his probation terms in the 343 Case, the 699 Case, and the 1675 Case. See Revocation Order at 1-2.

5.      On the same day, Judge Martinez sentences Garman for receiving or transferring a stolen motor vehicle in violation of N.M.S.A § 30-16-D-4, which is a felony offense. See Motion to Suppress Response at 1; Garman Closing Arguments at 9; United States Closing Arguments at 1; State of New Mexico v. Garman, Case No. D-202-CR-2020-856, Judgment and Sentence at 1-5 (County of Bernalillo, Second Judicial District, State of New Mexico, dated October 8, 2020, filed October 21, 2020)(admitted as United States Exhibit 1 at Suppression Hearing on March 6, 2025)("856 Judgment").

6.      Judge Martinez sentences Garman to a partially suspended four-year sentence -- eighteen months in custody, with two years suspended -- in State of New Mexico v. Garman, Case No. D-202-CR-2020-856 (County of Bernalillo, Second Judicial District, State of New Mexico)("856 Case"). See 856 Judgement at 3; Motion to Suppress Response at 1; United States Closing Arguments at 1.

7.      Judge Martinez sets Garman's partially suspended four-year sentence in the 856 Case to run concurrently with the 325-day sentence imposed in the Revocation Order for his three other State court cases: the 343 Case, the 699 Case, and the 1675 Case. See 856 Judgement at 3

8.      Judge Martinez sentences Garman to a probation term of two years and six months to follow his incarceration in the 856 Case. See 856 Judgement at 3; Motion to Suppress Response at 1; United States Closing Arguments at 1.

9.     "In addition to all standard conditions of probation," Judge Martinez imposes several additional probation conditions in the 856 Case, including that Garman: (i) may not possess or use any illegal drugs or alcohol; and (ii) may not possess any weapons.  856 Judgement at 3.

10.     In December, 2021, the Corrections Department assigns Jamie Grogan to serve as Garman's supervising officer for his probation term in the 856 Case.  See United States Motion to Suppress Response at 2; Transcript of March 6, 2025, Hearing at 16:7-11 (Roybal, Grogan)(taken March 6, 2025), filed April 10, 2025 (Doc. 73)("March 6, 2025, Tr.").

11.     Between December 2021 and March 2022, Garman meets with Grogan several times; he tells her that he is living at Albuquerque Opportunity Center in Albuquerque, New Mexico.  See March 6, 2025, Tr. at 23:12-24:9 (Roybal, Grogan).

12.     In March, 2022, Grogan learns that Garman is not living at Albuquerque Opportunity Center.  See United States Closing Arguments at 3; March 6, 2025, Tr. at 26:2-27:2 (Roybal, Grogan).

13.     In March, 2022, Grogan tries to reach Garman via telephone several times, but Garman does not respond to Grogan's telephone calls.  See United States Closing Arguments at 3 March 6, 2025, Tr. at 27:3-28:6 (Roybal, Grogan).

14.     On March 28, 2022, the Corrections Department issues an order for Garman's arrest. See State of New Mexico v. Garman, Case No. D-202-CR-2020-856, Arrest Order at 1 (County of Bernalillo, Second Judicial District, State of New Mexico, dated March 28, 2022)(admitted as United States Exhibit 3 at Suppression Hearing on March 6, 2025)("Arrest Order").

15.     The Arrest Order states that Garman has violated his probation conditions and is at risk of absconding.  See Arrest Order at 1.

16.     Grogan makes contact with Garman, tells him that there is an active warrant for his arrest, and encourages him to self-surrender.  See United States Closing Arguments at 3; March 6, 2025, Tr. at 30:4-31:2 (Roybal, Grogan).

17.     Despite Grogan's advice, Garman does not self-surrender.  See United States Closing Arguments at 3; March 6, 2025, Tr. at 31:3-31:5 (Roybal, Grogan).

18.     After the Corrections Department issues the Arrest Order, the New Mexico Corrections Department Security Threat Intelligence Unit ("STIU") takes over the matter, and STIU Officer Bonsemeyer leads the investigation into Garman's whereabouts.  See Motion to Suppress Response at 3; March 6, 2025, Tr. at 31:6-31:8 (Roybal, Grogan); id. at 49:1-3 (Roybal, Bonsemeyer).

19.     In May, 2023, a confidential source tells Bonsemeyer that Garman has been driving a white Audi and is living at Nova Peak Apartments, 1200 Louisiana Blvd NE, Albuquerque, New Mexico, with his then-girlfriend, Alexis Garcia.  See Motion to Suppress Response at 3; March 6, 2025, Tr. at 51:18-54:5 (Roybal, Bonsemeyer).

20.     The confidential source also tells Bonsemeyer that Garman is likely armed and that both Garman and Garcia have been using drugs.[2]  See Motion to Suppress Response at 3; United States Closing Arguments at 4; March 6, 2025, Tr. at 51:18-54:5 (Roybal, Bonsemeyer).

---

[2]Garman questions whether the confidential source tells Bonsemeyer that Garman is likely armed.  See Garman closing arguments at 13.  Garman notes that, although Bonsemeyer states that he likely would have documented the firearm information in his notes, this information is not in his notes.  See Garman Closing Arguments at 3 n.2; id. at 13; Draft Transcript of April 8, 2025, Hearing at 5:22-7:15 (Meyers, Bonsemeyer)(taken April 8, 2025)("April 8, 2025, Tr.")(The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers).  Both parties and the Court agree that Bonsemeyer does not document in his notes that Garman might be armed, even though Bonsemeyer says that he likely would have had that information in his notes.  See Offender History at 1-29 (dated March 28, 2022, to May 31, 2023), admitted as defendant's Exhibit D on April 8, 2025 ("Bonsemeyer Notes"); March 6, 2025 Tr. at 98:6-13 (Meyers, Bonsemeyer); April 8, 2025, Tr. at 46:1-4 (Roybal, Bonsemeyer).  This missing detail does not persuade the Court that the confidential informant never tells Bonsemeyer that Garman is likely armed.  Bonsemeyer says

21.     On May 31, 2023, at approximately 3:00 p.m., Bonsemeyer and his STIU team go to the Nova Peak Apartments to conduct surveillance.  See United States Closing Arguments at 4; March 6, 2025, Tr. at 54:6-16 (Roybal, Bonsemeyer).

22.     About an hour after they arrive, the STIU team observes a white Audi pull into the apartment complex and park behind apartment #10.  See United States Closing Arguments at 4; Garman Closing Arguments at 3; March 6, 2025, Tr. at 56:20-57:6 (Roybal, Bonsemeyer).

23.     Bonsemeyer observes Garman exit the white Audi, meet Garcia outside, and enter apartment #10.  See United States Closing Arguments at 4-5; March 6, 2025, Tr. at 57:7-59:24 (Roybal, Bonsemeyer).

24.     Bonsemeyer leads a group of STIU officers to the apartment's front door to arrest Garman.  See United States Closing Arguments at 5; March 6, 2025, Tr. at 59:25-60:18 (Roybal, Bonsemeyer).

25.      Bonsemeyer directs STIU Officer Aubyn Rhoades to go to the apartment's back side to make sure Garman does not escape through the back window.  See United States Closing Arguments at 5; March 6, 2025, Tr. at 60:19-62:12 (Roybal, Bonsemeyer).

26.     With Rhoades in place, Bonsemeyer knocks on the apartment's front door, announces the STIU team's presence, tells Garman that they have an arrest warrant, and orders Garman to come to the front door.  See United States Closing Arguments at 5; March 6, 2025, Tr. at 60:20-63:16 (Roybal, Bonsemeyer).

---

that he is "[a] hundred percent" sure that his source tells him that Garman is likely armed.  April 8, 2025, Tr. at 46:9 (Bonsemeyer).  Bonsemeyer is a credible witness.  He is an experienced law enforcement officer, and he provides detailed testimony about his investigation.  Other than identifying Bonsemeyer's notetaking shortcomings, Garman does not introduce evidence that damages Bonsemeyer's credibility.  Considering all of the evidence presented on this issue, the Court concludes that the confidential informant tells Bonsemeyer that Garman is likely armed.

27.     Garman does not come immediately to the front door.  See United States Closing Arguments at 5; March 6, 2025, Tr. at 63:17-20 (Roybal, Bonsemeyer).

28.     Instead, Garman tries to escape out the back window.[3]  See United States Closing Arguments at 5; March 6, 2025, Tr. at 63:21-64:6 (Roybal, Bonsemeyer); Transcript of March 17, 2025, Hearing at 8:9-15 (Rhoades)(taken March 17, 2025), filed April 10, 2025 (Doc. 72)("March 17, 2025, Tr.").

29.     After Rhoades tells the STIU that Garman is trying to escape, Bonsemeyer and the STIU team breach the apartment's front door and detain Garman and Garcia.  See United States Closing Arguments at 5; Motion to Suppress Response at 4; March 6, 2025, Tr. at 64:7-65:14 (Roybal, Bonsemeyer).

---

[3]Garman disputes that he tries to escape out the back window.  See Garman Closing Arguments at 4-5.  Garman makes several arguments.  First, Garman notes that there are bars on the apartment's back window, which suggest that "a person would not be able to exit through that window."  Garman Closing Arguments at 4.  Garman also attacks Rhoades' credibility, asserting that Rhoades says, on seventeen occasions, that he does not know, recall, or remember details from the investigation.  See Garman Closing Arguments at 4.  Garman also highlights lapel camera footage, where an STIU officer "remarked that '[i]f he made it to bedroom . . . .'" Garman Closing Arguments at 4 (quoting Andrew Limon Lapel Camera Footage at 1:20:00 (dated May 31, 2023)(admitted as Exhibit C at Suppression Hearing on March 17, 2025 ("Lapel Camera Footage").  None of these arguments is persuasive.  Despite making much of the bars on the window, Garman does not introduce evidence showing that the back window cannot be used as an exit.  See Garman Closing Arguments at 4 (noting only that Garman's investigator notices that the bars are affixed and that she "believe[s] that a person would not be able to exit through that window").  Even if the bars are bolted into the wall and Garman's investigator is correct, it is possible that Garman tries to escape, nonetheless, in a panicked frenzy as STIU approach.  Garman's arguments about Rhoades' memory also does not persuade the Court that Rhoades' testimony is incorrect.  Rhoades is a credible witness who testifies confidently that he observes, from about twenty-five feet away, Garman trying to escape through the back window.  See March 17, 2025, Tr. at 8:9-22 (Rhoades, Roybal).  Rhoades' inability to remember other details regarding an investigation from several years ago does not diminish his credibility on this important point.  The Lapel Camera Footage, where an officer says, "[i]f he made it to bedroom," also does not support Garman's narrative.  Lapel Camera Footage at 1:20:00.  This officer's conjecture about Garman's possible movements inside the apartment do not override Rhoades' eyewitness account.  Considering all of the evidence presented on this issue, the Court concludes that Garman tries to escape through the back window.

30.     When the STIU officers enter Apartment #10, they do not have any information about anyone else besides Garman and Garcia entering or leaving the apartment.  See March 17, 2025, Tr. at 39:15-18 (Giacci).

31.     Upon entering the apartment, Giacci observes in plain view drug paraphernalia in the apartment's living room.  See March 17, 2025, Tr. at 23:15-19 (Giacci); id. at 34:7-35:10 (Meyers, Giacci).

32.     With Garman and Garcia detained, the STIU team clears the apartment, i.e., makes sure that no one else is around.  See United States Closing Arguments at 6; March 6, 2025, Tr. at 65:15-66:15 (Roybal, Bonsemeyer).

33.     While clearing the apartment, Giacci observes in plain view a purple or pink handgun and drug paraphernalia, and Bonsemeyer observes in plain view drug paraphernalia and men's clothing.  See United States Closing Arguments at 6-7; March 6, 2025, Tr. at 66:24-68:6 (Roybal, Bonsemeyer); March 17, Tr. at 23:14-24 (Roybal, Giacci).

34.     Having observed several likely probation violations, Bonsemeyer directs a full search of the apartment.  See United States Closing Arguments at 6; March 6, 2025, Tr. at 68:7-11 (Roybal, Bonsemeyer).

35.     During the full search, STIU officers uncover eleven additional firearms, thousands of fentanyl pills, more drug paraphernalia, approximately $8,500.00 cash, and an earnings statement with Garman's name on it addressed to Apartment #10 at 1200 Louisiana Blvd NE, Albuquerque, New Mexico ("Apartment #10").  See Motion to Suppress Response at 4-5; March 6, 2025, Tr. at 68:12-76:9 (Roybal, Bonsemeyer); STIU Initial Photographs at 1-57 (dated May 31, 2023)(admitted as United States Exhibit 5 at Suppression Hearing on March 6, 2025)("STIU Initial Photographs").

36.     After STIU officers complete their search, Bonsemeyer determines that new charges against Garman may be warranted, and, accordingly, Bonsemeyer directs STIU Officer Chris Balcolm to contact the Bernalillo County Sheriff's Office for assistance.  See Motion to Suppress Response at 4; March 6, 2025, Tr. at 76:10-77:14 (Roybal, Bonsemeyer); March 17, 2025, Tr. at 61:18-64:25 (Roybal, Limon).

37.     Responding to Balcolm's request, Bernalillo County Sheriff's Office Deputy Andrew Limon arrives at the scene.  See Motion to Suppress Response at 4; March 6, 2025, Tr. at 66:24-68:6 (Roybal, Bonsemeyer); March 17, 2025, Tr. at 61:18-64:12 (Roybal, Limon).

38.     When Limon arrives, Balcolm tells him that STIU officers found firearms, narcotics, and large cash amounts in 1200 Louisiana Blvd NE, Apartment #10, Albuquerque.  See March 17, 2025, Tr. at 67:2-8 (Roybal, Limon).

39.     Limon contacts the Bernalillo County District Attorney's Office, whose representative tells Limon that STIU office may continue searching the apartment under the District Attorney's authority.  See March 17, 2025, Tr. at 66:5-13 (Roybal, Limon).

40.     Limon contacts Drug Enforcement Agency ("DEA") Officer Erick Castaneda for further assistance.  See March 17, 2025, Tr. at 66:14-67:13 (Roybal, Limon).

41.     Castaneda tells Limon to tell the STIU officers to stop searching the apartment while Castaneda applies for a search warrant.  See March 17, 2025, Tr. at 67:14-22 (Roybal, Limon).

42.     STIU officers stop searching the apartment.  See March 17, 2025, Tr. at 67:23-24 (Roybal, Limon).

43.     When STIU officers conduct their initial search of Apartment #10, Garman lives there.[4]  See STIU Initial Photographs at 13 (depicting a men's jacket); id. at 12 (depicting Garman's earnings statement); Search Warrant Photographs at 60-64 (dated May 31, 2023)(admitted as United States Exhibit 6 at Suppression Hearing on March 6, 2025)("Search Warrant Photographs")(depicting Garman's earnings statement).

44.     At approximately 8:33 p.m., Castaneda obtains a search warrant for the apartment, which the Honorable Britt Baca-Miller, District Judge, County of Bernalillo, Second Judicial District, State of New Mexico signs, for 1200 Louisiana Blvd NE, Apartment #10.  See State of New Mexico v. 1200 Louisiana Blvd NE, Apt 10, Case No. D-202-SW-2023-1180, Search Warrant at 1-8 (County of Bernalillo, Second Judicial District State of New Mexico, dated May 31, 2023)(admitted as United States Exhibit 4A at Suppression Hearing on March 6, 2025)("Apartment Search Warrant").

45.     At approximately 8:51 p.m., Limon, Castaneda, and other law enforcement officers execute the Apartment Search Warrant and search the apartment.  See Motion to Suppress Response at 4-5; March 17, 2025, Tr. at 72:13-73:19 (Roybal, Limon); March 17, 2025, Tr. at 67:25-72:11 (Roybal, Limon); id. at 76:13-15 (Meyers, Limon); Apartment Search Warrant at 6.

46.     On June 1, 2023, at approximately 3:51 p.m., Bernalillo County Sheriff's Office Deputy Chris Pena obtains a search warrant, which the Honorable William Parnall, District Judge,

---

[4]Garman insists that his search condition does not apply to Apartment #10, because, according to Garman, "Garman was an overnight guest of Ms. Garcia."  Motion to Suppress at 4. Garman does not assert, however, that he lives anywhere else on May 31, 2023.  See Motion to Suppress at 1-14; Motion to Suppress Reply at 1-8; Garman Closing Arguments at 1-19. Moreover, STIU officers searching the apartment uncover men's clothing and an earnings statement addressed to Garman that lists his address as Apartment #10 at 1200 Louisiana Blvd NE, Albuquerque, New Mexico.  See SITU Initial Photographs at 13 (depicting a men's jacket); id. at 12 (depicting Garman's earnings statement); Search Warrant Photographs at 60-64 (depicting Garman's earnings statement).  Thus, the Court concludes that Garman lives at Apartment #10 on May 31, 2023.

County of Bernalillo, Second Judicial District, State of New Mexico signs, for the white Audi vehicle, which Garman drives before his arrest.  See State of New Mexico v. 2010 White Audi Q5, Case No. D-202-SW-2023-1954, Search Warrant at 1-6 (County of Bernalillo, Second Judicial District State of New Mexico, dated June 1, 2023)(admitted as United States Exhibit 4B at Suppression Hearing on March 6, 2025)("Car Search Warrant").

47.     On June 2, 2023, at approximately 9:02 a.m., Pena, Castaneda, and other law enforcement officers execute the Car Search Warrant and search the white Audi.  See Car Search Warrant at 6.

48.     After conducting all three searches, law enforcement officers locate and seize: (i) twelve firearms; (ii) ammunition; (iii) nineteen firearms magazines; (iv) several firearms parts; (v) approximately 3,000 fentanyl pills; (vi) drug paraphernalia; (vii) approximately $8,500.00 cash; and (viii) three cellular telephones.  See Motion to Suppress Response at 4-5; March 17, 2025, Tr. at 67:25-72:12 (Roybal, Limon); Apartment Search Warrant at 6-7; Car Search Warrant at 6; Search Warrant Photographs at 1-90 (dated May 31, 2023)(admitted as United States Exhibit 6 at Suppression Hearing on March 6, 2025)("Search Warrant Photographs").

## PROCEDURAL BACKGROUND

This section outlines this litigation's procedural history.  First, the Court describes Garman's indictment.  Second, the Court discusses the Motion to Suppress briefs.  Third, the Court summarizes the three suppression hearings.  Fourth, the Court discusses the parties' written closing arguments.

### 1.     The Indictment.

On July 26, 2023, a federal Grand Jury indicts Garman.  See Indictment at 1, filed July 26, 2023 (Doc. 1)("Indictment").   The Indictment alleges that Garman commits three crimes: (i) possessing with intent to distribute more than forty grams of fentanyl, in violation of

21 U.S.C. §§ 841(a)(1) and (b)(1)(B); (ii) possessing a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i); and (iii) possessing a firearm as a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924. See Indictment at 1-2. The Indictment also states that Garman "shall forfeit to the United States, pursuant to 21 U.S.C. § 853," the firearms, magazines, ammunition, and cash, which law enforcement obtains when they search 1200 Louisiana Blvd NE, Apartment #10, Albuquerque, and the white Audi. See Indictment at 3-4.

### 2. The Motion to Suppress Briefs.

The Court proceeds through the Motion to Suppress briefs chronologically. First, the Court describes the Motion to Suppress. Next, the Court describes the Motion to Suppress Response. Finally, the Court describes the Motion to Suppress Reply.

### a. The Motion to Suppress.

On December 16, 2024, Garman asks the Court to suppress: (i) all evidence seized during the searches of 1200 Louisiana Blvd NE, Apartment #10, Albuquerque; and (ii) all evidence seized during the search of the white Audi. See Motion to Suppress at 1. As a threshold matter, Garman asserts that he has Fourth Amendment standing to challenge the apartment search, because he is an overnight guest. See Motion to Suppress at 5. Next, Garman argues that the Court should suppress the evidence for three reasons. See Motion to Suppress at 6-12. First, Garman argues that the warrantless apartment search is not a protective sweep, because: (i) STIU officers searched the entire apartment; and (ii) there are no "specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house." Motion to Suppress at 6-8. Second, Garman argues that warrantless apartment search is not a lawful probationary search, because: (i) Garcia's apartment is not subject to Garman's search condition; and (ii) STIU officers do not have reasonable suspicion to search Garcia's apartment on May 31, 2023. See Motion to Suppress at 8-10. On the reasonable suspicion issue, Garman argues that the information investigators have

when they search the apartment -- Garman absconding from his probation officer and a confidential informant stating that Garman is staying at Garcia's apartment -- does not warrant reasonable suspicion that criminal activity is afoot. See Motion to Suppress at 9-10. Third, Garman argues that the Apartment Search Warrant and the Car Search Warrant do not save the allegedly illegally obtained evidence, because (i) those warrant-based searches "were based directly upon the initial warrantless search of the apartment"; and (ii) Judge Baca-Miller, who signs the Apartment Search Warrant, is not a neutral and detached magistrate. Motion to Suppress at 10-12. On the neutrality issue, Garman argues that Judge Baca-Miller is biased against him, because she represented him previously in several cases, they "argued frequently" about Judge Baca-Miller's representation, and, eventually, Judge Baca-Miller "was forced to withdraw in the late stages of the representation due to a conflict of interests." Motion to the Suppress at 10.

### b.    The Motion to Suppress Response.

On January 6, 2025, the United States responds to Garman's Motion to Suppress. See Motion to Suppress Response at 1. The United States "opposes suppression of the evidence recovered on May 31, 2023, including twelve (12) firearms, approximately 3,000 fentanyl pills, ammunition, and approximately $8,500 in United States currency." Motion to Suppress Response at 1. The United States opposes suppression for three reasons. See Motion to Suppress Response at 5-17. First, the United States argues that the initial warrantless apartment search is a valid probationary search, because the STIU officers have reasonable suspicion to believe that Garman is living at 1200 Louisiana Blvd NE, Apartment #10 and committing criminal activity, i.e., doing drugs and possessing a firearm. See Motion to Suppress Response at 6-11. In the alternative, the United States argues that, at the least, the STIU officers are allowed to enter the apartment to execute Garman's arrest warrant and apprehend him; after entering the apartment and seeing a gun in plain view, the STIU officers may search the apartment "pursuant to the terms of probation

Defendant agreed to."  Second, the United States argues that, although the search warrants are not necessary, they are valid, because they articulate probable cause and establish a nexus between the apartment, the vehicle, and the investigation into Garman's drug trafficking and firearm possession crimes.  See Motion to Suppress Response at 11-13.  The United States argues that law enforcement would have gotten a warrant even if the STIU officers had not searched the apartment, because the information obtained before the warrantless search -- Garman's absconder status, the confidential informant's tip about Garman's drug use and gun possession, the firearm in plain view, and Garman's attempt to flee the apartment -- establish probable cause.  See Motion to Suppress Response at 12-13.  Third, the United States argues that Judge Baca-Miller is neutral and that, even if she is not neutral, the United States v. Leon, 468 U.S. 897, 907 (1984)("Leon") good-faith exception applies.  See Motion to Suppress Response at 13-18.  The United States thus argues that, because the search warrants are valid -- and, if even they are not, the Leon good-faith exception applies -- the Court should not exclude the challenged evidence, because that evidence would have been discovered inevitably, even without the initial warrantless search.  See Motion to Suppress Response at 11-18.

      **c.**      **The Motion to Suppress Reply**.

On January 20, 2025, Garman replies to the Motion to Suppress Response.  See Reply to Response to Motion to Suppress at 1, filed January 20, 2025 (Doc. 61)("Motion to Suppress Reply").  First, Garman argues that the initial warrantless search "exceeded any permissible bounds" for three reasons: (i) STIU officers could have arrested Garman outside the apartment; (ii) STIU officers do not have "proof" that Garman is living at Garcia's apartment; and (iii) Garman's alleged probation violation -- absconding -- is minor.  Motion to Suppress Reply at 1-4.  Second, Garman argues that law enforcement would not have discovered inevitably the challenged evidence, because the United States could not have gotten a search warrant with the

information they have before conducting the initial warrantless search. <u>See</u> Motion to Suppress Reply at 4-5. Third, Garman argues that the <u>Leon</u> good-faith exception does not apply to the Apartment Search Warrant, because Judge Baca-Miller is biased against him, and the Apartment Search Warrant's affiant -- Castaneda -- knew about "Judge Baca-Miller's acrimonious former representation" of Garman. Motion to Suppress Reply at 6.

### 3.  **The Suppression Hearings.**

The Court held suppression hearings on March 6, 2025, March 17, 2025, and April 8, 2025. <u>See</u> March 6, 2025, Hearing Minutes at 1; March 17, 2025, Hearing Minutes at 1; April 8, 2025, Hearing Minutes at 1. At the March 6, 2025, Hearing, the United States calls Grogan and Bonsemeyer as witnesses. <u>See</u> March 6, 2025, Hearing Minutes at 1-2. Garman cross-examines both witnesses. <u>See</u> March 6, 2025, Hearing Minutes at 1-2. At the March 17, 2025, Hearing, the United States calls Rhoades, Giacci, Limon, and Castaneda as witnesses. <u>See</u> March 17, 2025, Hearing Minutes at 1-2. Garman cross-examines all four witnesses. <u>See</u> March 17, 2025, Hearing Minutes at 1-2. At the April 8, 2025, Hearing, the United States calls Bonsemeyer again as a witness, and Garman, again, cross-examines Bonsemeyer. <u>See</u> April 8, 2025, Hearing Minutes at 1. Garman calls his private investigator, Paula Sanchez-Knudsen, as a witness. <u>See</u> April 8, 2025, Hearing Minutes at 1; April 8, 2025, Tr. at 52:8-9 (Sanchez-Knudsen). The United States cross-examines Sanchez-Knudsen. <u>See</u> April 8, 2025, Hearing Minutes. at 1. The parties agree to submit written closing arguments. <u>See</u> April 8, 2025, Hearing Minutes at 2.

### 4.  **Garman's Closing Arguments.**

On May 10, 2025, Garman submits written closing arguments. <u>See</u> Garman Closing Arguments at 1. First, Garman argues that he "was not subject to a probation search condition on the sole case for which he was on probation (D-202-CR-202000856) at the time." Garman Closing Arguments at 9. On this issue, Garman asserts that the United States has not introduced a signed

probation compliance form in the 856 Case. See Garman Closing Arguments at 9-11. Without this signed form, Garman argues, the United States does not show that Garman is subject to a probation search condition when STIU officers search 1200 Louisiana Blvd NE, Apartment #10, Albuquerque without a warrant on May 31, 2023. See Garman Closing Arguments at 9-11. Garman argues that the Probation Compliance Forms, which the United States introduces to show that Garman is subject to a search condition, do not apply here, because those forms predate his probationary sentence in the 856 Case and, thus, those Probation Compliance Forms are for his three other State court cases, rather than for the 856 Case, which is his only active probation case on May 31, 2023. See Garman Closing Arguments at 9-11. Garman also attaches as an exhibit the transcript of his sentencing in the 856 Case, which, according to Garman, "confirms that Mr. Garman was not subject to a warrantless search as a condition of his probation," because "[t]he only discussion about conditions of his probation related to whether or not drug testing could be performed by oral testing rather than urine testing." Garman Closing Arguments at 12. Garman argues that, without a signed probation compliance form imposing a search condition, he is being denied due process, because he is not on notice that he is subject to a search condition for the 856 Case. See Garman Closing Arguments at 12.

Second, Garman argues that, even if Garman is subject to a search condition, the probationary search is unlawful, because the STIU officers need reasonable suspicion to enforce the search condition, and they do not have reasonable suspicion to believe that Garman is committing a crime before they enter the apartment. See Garman Closing Arguments at 12-13. Third, Garman asserts that the warrantless apartment search is not a legitimate protective sweep, because the STIU officers "had no legitimate reason to enter the apartment," and there "was no indication that anyone else was inside the apartment." Garman Closing Arguments at 13-15. Fourth, Garman maintains that "plain view does not justify" the search, because "it is only after

officers illegally entered the apartment -- under the guise of a safety search -- when they made any observations." Garman Closing Arguments at 15-16 (emphasis in original). Fifth, Garman insists that "neither warrant nor good faith saves this search," for three reasons: (i) the warrants rely on information obtained from the unlawful warrantless search; (ii) the STIU officers' decision to allow Garman to enter the apartment -- rather than arrest him outside the apartment -- is made in bad faith, because it reveals their "singular goal to conduct a warrantless search of Ms. Garcia's apartment"; and (iii) Judge Baca-Miller is biased against Garman. Garman Closing Arguments at 16-18. In sum, Garman argues: "Because the search of the apartment was unlawful, the Court should suppress the discovery of the firearms, drugs and money which were recovered. A subsequent search of the car should also be suppressed as the fruit of the unlawful initial search and seizure." Garman Closing Arguments at 19.

     **5.**     **The United States' Closing Arguments**.

On June 2, 2025, the United States submits written closing arguments. See United States Closing Arguments at 1. The United States maintains that Garman is subject to a search condition on May 31, 2023, because he is still on probation for the 856 Case at that time. See United States Closing Arguments at 2-4. The United States reviews the suppression hearing testimony and argues that the initial warrantless search is lawful because:

> (1) Defendant was subject to a term of state probation; (2) Defendant stopped complying with his mandatory conditions of state probation; (3) there was a warrant for his arrest; (4) the STIU team received reliable information from a confidential source about Defendant's whereabouts; (5) Defendant did not comply with the initial commands to go to the front door and instead attempted to flee from a back window; and (6) upon breaching the front door and while conducting a safety sweep of the apartment, the STIU team observed numerous probation violations in plain view, including drug paraphernalia and a loaded firearm.

United States Closing Arguments at 7. The United States asserts that "[t]his case represents the very definition of reasonable suspicion and the Court's legal analysis can begin and end on these facts." United States Closing Arguments at 7.

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.))(brackets in United States v. Jones, but not in Kyllo v. United States).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006))). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court of the United States holds that, in the law enforcement context, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted). See United States v. Knapp, 917 F.3d 1161, 1165 (10th Cir. 2019)("The warrantless search rule, however, is subject to several exceptions.").

1.      __Reasonable Government Searches__.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. __Kentucky v. King__, 563 U.S. 452, 459 (2011)(quoting __Brigham City v. Stuart__, 547 U.S. at 403. __See__ __Samson v. California__, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." (quoting __United States v. Knights__, 534 U.S. 112, 118 (2001))).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." __United States v. Knights__, 534 U.S. at 121.  The Supreme Court justifies this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" __Vernonia Sch. Dist. 47J v. Acton__, 515 U.S. 646, 654 (1995)(quoting __New Jersey v. T.L.O.__, 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" __Samson v. California__, 547 U.S. at 848 (quoting __United States v. Knights__, 534 U.S. at 118).  __See__ __Banks v. United States__, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting __United States v. Knights__, 534 U.S. at 119-20)).

As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (quoting Skinner v. Ry. Labor Executives'

Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness

under the Fourth Amendment is not a concrete test:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the

individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting

that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because

a condition of his probation was to consent to search of his apartment without notice or probable

cause, and because he clearly was notified and informed of the provision); Banks v. United States,

490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited

expectation of privacy than the ordinary citizen, and noting that "'[w]hat is "reasonable" under the

fourth amendment for a person on conditional release, or a felon, may be unreasonable for the

general population'")(quoting Green v. Berge, 354 F.3d 675, 680 (7th Cir. 2004)(Easterbrook, J.,

concurring))(internal quotations have no citation); Boling v. Romer, 101 F.3d 1336, 1340 (10th

Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex

offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search

and seizure.  This is so in light of an inmate's diminished privacy rights . . . .").

As the Honorable Elena Kagan, Associate Justice of the Supreme Court, notes, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 569 U.S. 1, 13 (2013)("Jardines")(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))(alteration in Jardines, but not in Georgia v. Randolph).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, notes: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)).

### 2.    Florida v. Jardines.

In Florida v. Jardines, Justice Scalia holds that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search.  569 U.S. at 11.  Justices Thomas, Ginsburg, Sotomayor, and Kagan join Justice Scalia's majority opinion in Florida v. Jardines.  Justice Kagan files a separate concurring opinion, in which Justices Ginsburg and Sotomayor join, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."  569 U.S. at 16 (Kagan, J., concurring).  Justice Alito dissents, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer join his opinion.

In Florida v. Jardines, the Miami-Dade, Florida, police department and the Drug Enforcement Administration receive a tip that the defendant Jardines is growing marijuana in his home, and then send a surveillance team to Jardines' home.  See 569 U.S. at 3.  Observing nothing of note in the first fifteen minutes watching the home, two detectives approach the home

accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes. See Jardines, 569 U.S. at 3. As the dog approaches Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." 569 U.S. at 3. The dog's handler then immediately leaves the porch, and tells the other agents and officers at the scene that there is a positive alert for drugs, at which time the officers apply for and receive a search warrant for the residence, the execution of which reveals marijuana plants. See 569 U.S. at 3. Jardines is arrested for trafficking in marijuana and moves to suppress the evidence based on an illegal search. See 569 U.S. at 3. Justice Scalia holds that the use of a drug-sniffing dog is a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

569 U.S. at 5. Justice Scalia notes that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 569 U.S. at 6 (quoting Oliver v. United States, 466 U.S. at 176). Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text." 569 U.S. at 6.

Justice Scalia holds that "the officers' investigation took place in a constitutionally protected area," the home, because the front porch is the home's curtilage. Jardines, 569 U.S. at 7. Justice Scalia then "turn[s] to the question of whether it was accomplished through an unlicensed physical intrusion," 569 U.S. at 5, and reasons:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. ]Ciraolo, 476 U.S. [207,] 213

- 24 -

[(1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Id.  Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."  2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

Jardines, 569 U.S. at 7-8.  Justice Scalia notes that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concludes that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else.  There is no customary invitation to do that."  Jardines, 569 U.S. at 9 (emphasis in original).  Justice Scalia explains:

An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

Jardines, 569 U.S. at 3.

Justice Scalia further notes that, in United States v. Jones, the Supreme Court concludes that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under Katz v. United States] when the government gains evidence by physically intruding on

constitutionally protected areas."  Jardines, 569 U.S. at 11 (quoting United States v. Jones, 565 U.S. at 409).  Because the Supreme Court concludes that the conduct is a Fourth Amendment search under the trespass-based analysis, therefore, it holds that it is unnecessary to consider whether the conduct amounts to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz.  One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy.  That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

Jardines, 569 U.S. at 11.

   **3.    Vehicle Searches.**

   One exception to the Fourth Amendment search-warrant requirement is the automobile exception, which allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity.  See Collins v. Virginia, 584 U.S. 586, 591-92 (2018).  While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  Under the automobile-exception to the warrant requirement, however, a warrant generally is not required.  See Carroll v. United States, 267 U.S. 132, 153 (1925)(establishing the automobile exception for vehicles, "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought" unlike "a store, dwelling house, or other structure").  The ongoing exigent circumstance that the

vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.  See Collins v. Virginia, 584 U.S. at 596 (declining to apply the automobile exception to a motorcycle parked in the curtilage of a house, because such a search "would unmoor the exception from its justification" that a vehicle poses a risk of immediate mobility); Maryland v. Dyson, 527 U.S. 465, 467 (1999)("[W]here there [is] probable cause to search a vehicle[,] 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'")(quoting United States v. Ross, 456 U.S. at 809)(emphasis added in Maryland v. Dyson); California v. Carney, 471 U.S. 386, 393 (1985)(applying the automobile exception to the defendant's mobile home, because it was "readily mobile" and "could readily have been moved beyond the reach of the police").

Thus, if the vehicle is readily mobile, "'probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence.'"  United States v. Phillips, 71 F.4th 817, 823 (10th Cir. 2023)(quoting United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001)).  The search's object and the places in which there is probable cause to believe that the object may be found define the scope of a warrantless vehicle search.  See United States v. Ross, 456 U.S. 798, 824 (1982).  Accordingly, if probable cause justifies a vehicle search, it justifies the search of every part of the vehicle in which the evidence might be found, including closed compartments, containers, packages, and trunks, and any contents or containers that may conceal the object of the search.  See California v. Acevedo, 500 U.S. 565, 574 (1991); Wyoming v. Houghton, 526 U.S. 295, 304-07 (1999); United States v. Rosborough, 366 F.3d 1145, 1152-53 (10th Cir. 2004).

**4.    Searches Incident to Arrest.**

"Among the exceptions to the warrant requirement is a search incident to a lawful arrest." Arizona v. Gant, 556 U.S. 332, 338 (2009)("Gant").  The exception "derives from interests in

officer safety and evidence preservation that are typically implicated in arrest situations." Gant, 556 U.S. at 338. The search-incident-to-lawful-arrest exception enables the search "of the arrestee's person" in addition to "the area within the arrestee's 'immediate control.'" United States v. Knapp, 917 F.3d at 1165 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)). The Supreme Court defines the area within the arrestee's "immediate control" as "the area from within which he might gain possession of a weapon or destructible evidence," Chimel v. California, 395 U.S. at 763, a limitation that "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy," Gant, 556 U.S. at 339.

The search-incident-to-lawful-arrest exception also may enable a search of an automobile where a recent occupant is placed under arrest. See New York v. Belton, 453 U.S. 454, 459-60 (1981). An automobile search incident to a recent occupant's arrest is Constitutional if: (i) "the arrestee is within reaching distance of the vehicle during the search"; or (ii) "if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" Davis v. United States, 564 U.S. 229, 235 (2011)(quoting Gant, 556 U.S. at 343). See United States v. Knapp, 917 F.3d at 1168 (explaining that automobile searches incident to a lawful arrest under Gant "are justified either by the 'twin rationales of Chimel' or by an arresting officer's reasonable belief that the vehicle contains evidence of the crime precipitating the arrest" (quoting Gant, 556 U.S. at 342-43)). Although a search incident to arrest must be a "contemporaneous incident of [a lawful] arrest," New York v. Belton, 453 U.S. at 460, it is of no moment that a search precedes an arrest, so long as "probable cause for the arrest precede[s] the search," United States v. Smith, 389 F.3d 944, 952-53 (9th Cir. 2004).

5.    **Fourth Amendment Standing**.

The Tenth Circuit refers to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing." United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched."). Accordingly, the Court, tracing the Tenth Circuit's language, refers to this test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).  The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test now expressly has been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproves of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by

the search and seizure which he seeks to challenge." 439 U.S. at 133. Dispensing with this label,

the Supreme Court notes:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain <u>Jones[ v. United States</u>, 362 U.S. 257 (1960, overruled by <u>United States v. Salvucci</u>, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," <u>Simmons v. United States</u>, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in <u>Jones</u> also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

<u>Rakas v. Illinois</u>, 439 U.S. at 138-39. The Supreme Court emphasizes:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within the purview of substantive Fourth Amendment law than within that of standing.

<u>Rakas v. Illinois</u>, 439 U.S. at 139-40. In <u>Minnesota v. Carter</u>, the Supreme Court recognizes that

<u>Rakas v. Illinois</u> put an end to the Fourth Amendment standing analysis as separate from the

substantive Fourth Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id., at 140 . . . .

Minnesota v. Carter, 525 U.S. at 87-88. The Supreme Court notes that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States' reasonable-expectation-of-privacy analysis now is a substantive Fourth Amendment test, as opposed to a standing test. See Rakas v. Illinois, 439 U.S. at 139.

**6.    Probation Searches.**

Although law enforcement officers typically must obtain a search warrant which probable cause supports before conducting a search, there are exceptions to this requirement where "'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" United States v. Carter, 511 F.3d 1264, 1267 (10th Cir. 2008)(quoting Griffin v. Wisconsin. 483 U.S. 868, 873 (1987)). The Supreme Court concludes that, in the State probation context, special needs negate the requirement that an officer obtain a warrant supported by probable cause. See United States v. Carter, 511 F.3d at 1268 (citing Griffin v. Wisconsin, 483 U.S. at 875). See, e.g., United States v. Romo, No. CR 14-2352, 2015 WL 13651108, at *4 (D.N.M. December 2, 2015)(Armijo, C.J.)(unpublished)(stating that New Mexico's State probation system presents a "special need" under Griffin v. Wisconsin). For a probation search to meet the Fourth Amendment's requirements, it must be "'carried . . . out pursuant to state law which itself satisfies the Fourth Amendment's reasonableness requirement.'" United States v. Carter, 511 F.3d at 1268 (quoting United States v. Lewis, 71 F.3d 358, 361 (10th Cir. 1995)).

In United States v. Knights, 534 U.S. 112 (2001), the Supreme Court concludes that a probationer who signs a probation agreement that "clearly expressed the search condition" has a "significantly diminished . . . reasonable expectation of privacy." 534 U.S. at 119-20. See United States v. Blake, 284 F. App'x 530, 535-536 (10th Cir. 2008)("The Supreme Court has concluded that 'probationers and parolees do not enjoy the full suite of rights provided by the Fourth Amendment.'" (citing United States v. Trujillo, 404 F.3d 128, 1241-42 (10th Cir. 2005)(discussing Griffin v. Wisconsin, 483 U.S. 868 (1987), and United States v. Knights, 534 U.S. 112 (2001))). In so concluding, the Supreme Court states that, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." United States v. Knights, 534 U.S. at 119. The Tenth Circuit "has interpreted *Knights* to mean that 'a probation search [is] permissible so long as supported by reasonable suspicion, regardless of the motivation for the search.'" United States v. Freeman, 479 F.3d 743, 747 (10th Cir. 2007)(quoting United States v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002)(alteration in United States v. Freeman, but not United States v. Tucker)).

Reasonable suspicion is "['] merely a particularized and objective basis for suspecting criminal activity.'" United States v. Freeman, 479 F.3d at 748 (quoting United States v. Tucker, 305 F.3d at 1200). While reasonable suspicion requires "'some minimal level of objective justification,'" it requires less justification than is required to show probable cause. United States v. Freeman, 479 F.3d at 749-50 (quoting INS v. Delgado, 466 U.S. 210, 217 (1984), and citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). In assessing whether reasonable suspicion exists for a search, courts "consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances." United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).

In a number of instances and in a variety of contexts, the Tenth Circuit has upheld probation searches when the officer conducting the search has reasonable suspicion to conduct the search pursuant to a probation agreement's terms. In United States v. Blake, the Tenth Circuit refuses to suppress evidence found during a search pursuant to the defendant's wife's probation agreement of a residence that the defendant shared with his wife. See 284 F. App'x at 535-37. In United States v. Stewart, 273 F. App'x 768 (10th Cir. 2008), the Tenth Circuit declines to suppress evidence found during the search of a defendant's residence, pursuant to the defendant's probation agreement, that police and probation agents conduct while attempting to execute an arrest warrant. See 273 F. App'x at 769-71. In United States v. Carter, the Tenth Circuit declined to suppress evidence found during the search of a defendant's residence on the basis of a tip which a social worker relayed to the defendant's probation officer that the defendant was in breach of his probation agreement, and also declined to suppress evidence found during a subsequent consensual search. See 511 F.3d 1266-69.

### 7.    **Probable Cause for Search Warrants**.

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant." United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. 213, 239 (1983)), aff'd, 749 F.3d 900 (10th Cir. 2014). Probable cause requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000). "Probable cause undoubtedly requires a nexus between

suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d

927, 937 (10th Cir. 1990).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. at 238 (internal quotations have no citation).  See United States v.

Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit

supports a finding of probable cause, the court must review the affidavit as a whole and look to

the totality of the information contained therein), abrogated on other grounds by Corley v. United

States, 556 U.S. 303 (2009).  In making his or her determination, the magistrate judge "may draw

reasonable inferences from the material provided in the warrant application."  United States v.

Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"Reviewing courts should give the magistrate's ultimate probable cause decision 'great

deference.'" United States v. Rowland, 145 F.3d at 1204 (quoting United States v. Cusumano, 83

F.3d 1247, 1250 (10th Cir. 1996)).  The Court's duty is "simply to ensure that the magistrate had

a 'substantial basis for . . . conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S.

at 238-39 (quoting Jones v. United States, 362 U.S. at 271)(ellipses and brackets in Illinois v.

Gates, but not in Jones v. United States).  This deference is appropriate to further the Fourth

Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733

(1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of

a search warrant should begin with the rule 'that the informed and deliberate determinations of

magistrates empowered to issue warrants . . . are to be preferred over the hurried action of

officers . . . .'" (quoting United States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other

grounds by Illinois v. Gates, 462 U.S. 213.  Because of the strong preference for warrants, "in a

doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. 102, 106 (1965).

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." United States v. Alabi, 943 F. Supp. 2d 1201, 1253-54 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished). "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006). Specifically, the Court should not defer to a magistrate judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x 815, 822 (10th Cir. 2006)(citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

### 8.    Specificity Required in Warrants.

In several opinions, the Tenth Circuit has clearly established that items to be seized must be described within the search warrant for seizure of those items to be reasonable. The Fourth Amendment requires search warrants to particularly describe the place to be searched, and the persons or things to be seized. See United States v. Angelos, 433 F.3d 738, 744 (10th Cir. 2006). Furthermore, the Tenth Circuit has held that "[t]he Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings." United States v.. Campos, 221 F.3d 1143, 1147 (10th Cir. 2000)(quoting United States v. Carey, 172 F.3d 1268, 1271 (10th Cir. 1999). "A warrant's description of things to be seized is sufficiently particular if it allows the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Hargus, 128

F.3d 1358, 1362 (10th Cir. 1997). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Davis v. Gracey, 111 F.3d 1472, 1478 (10th Cir. 1997)(quoting Marron v. United States, 175 U.S. 192, 196 (1927)). "The test applied to the description of the items to be seized is a practical one . . . and the language in warrants is to be read in a common sense fashion . . . As an irreducible minimum, a proper warrant must allow the executing officers to distinguish between items that may and may not be seized." Davis v. Gracey, 111 F.3d at 1478. See Copar Pumice Co. v. Morris, No. CIV 07-79 JB/ACT, 2008 WL 2323488, at *11-12 (D.N.M. Mar. 21, 2008)(Browning, J.)

### LAW REGARDING FOURTH AMENDMENT SEIZURES

The Fourth Amendment protects individuals from unreasonable seizures. See U.S. Const. amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." Brendlin v. California, 551 U.S. 249, 254 (2007)(quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). See United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017). "[W]when an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628). "'If a reasonable person would feel free to terminate the encounter, then he or she has not

been seized.'" United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))). The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)). For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests. See United States v. Samilton, 56 F.4th 820 (10th Cir. 2022); Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

### 1.    **Consensual Encounters**.

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter. See Oliver v. Woods, 209 F.3d at 1186. For example, officers generally may "go to a person's home to interview him." United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990). "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business." 1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 769 (6th ed. 2020)("LaFave").

### 2.    **Investigative Stops**.

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit notes: "Terry was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . .

[other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty." United States v. King, 990 F.2d at 1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968), and then quoting Terry v. Ohio, 392 U.S. at 27). The Tenth Circuit recognizes that, in Terry v. Ohio, the Supreme Court identifies two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk." United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Adams v. Williams, 407 U.S. 143, 147-48 (1972)). The Tenth Circuit explains:

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557. When evaluating either of these actions, a court asks whether the action was reasonable under the Fourth Amendment. See United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

**3.      Investigative Detentions and Reasonable Suspicion.**

A police-citizen encounter that is not consensual may be a Constitutional investigative detention. See Dorato v. Smith, 108 F. Supp. 3d at 1118. An investigative detention occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'" Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146). Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment. Dorato v. Smith, 108 F. Supp. 3d at 1118. First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which

justifies the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)). Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)("'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.").

### 4. **Frisks.**

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)). An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, a court should consider the totality of

the circumstances.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

 **5. Traffic Stops.**

 "'A traffic stop is a seizure within the meaning of the Fourth Amendment  . . . .'"  United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)).  "'For the duration of a traffic stop,  . . .  a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'"  United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)).  "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's."  United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)).  "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop."  United States v. White, 584 F.3d at 945.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131, and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart."  United States v. Erwin, 875 F.2d at 270.

 The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. at 459 (quoting Brigham City v. Stuart, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for
> investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether
> the officer's action was justified at its inception, and whether it was reasonably
> related in scope to the circumstances which justified the interference in the first

place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220).  A

court must examine "both the length of the detention and the manner in which it is carried out,"

United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration

and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting

United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based

on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary,

lasting no longer than necessary to effectuate the purpose of the [further] detention, and the scope

of the [further] detention must be carefully tailored to its underlying justification.'" United States

v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir.

1997))(brackets in United States v. Wilson, but not in United States v. Wood).  "A traffic stop is

justified at its inception if an officer has . . . reasonable articulable suspicion that a particular

motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder,

557 F.3d at 1134.  See United States v. Martinez, No. CR 24-0707 JB, 2024 U.S. Dist. LEXIS

214431, at *94 (D.N.M. November 25, 2024)(Browning, J.)(concluding that the police officer

initiates Constitutionally the traffic stop of a car, because there is probable cause to believe that at

least some of the car's passengers do not have their seatbelts fastened).

###    6.    Arrests.

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or

detention," Oliver v. Woods, 209 F.3d at 1186, that is "reasonable only if supported by probable

cause," United States v. Hammond, 890 F.3d 901, 904 (10th Cir. 2018).  A police-citizen encounter

that goes beyond the limits of a stop under Terry v. Ohio is an arrest.  See United States v. Perdue,

8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes

beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[5]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause." United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.). See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013)(unpublished). "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001)). Although "[p]robable cause does not require facts sufficient for a finding of guilt  . . . , it does require 'more than mere suspicion.'" United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)). The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an

---

[5]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs  . . . does not always elevate a detention into an arrest.").

investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can

be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in
> the sense that reasonable suspicion can be established with information that is
> different in quantity or content than that required to establish probable cause, but
> also in the sense that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89,

96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing

Florida v. Royer, 460 U.S. at 507, and United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir.

2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that

probable cause existed to arrest the defendant based on the 'information possessed by the

[arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting

Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995))(alterations in Olsen v. Layton Hills Mall,

but not in Romero v. Fay).

### 7.  **When a Detention Becomes an Arrest**.

The Tenth Circuit holds that a police-citizen encounter which goes beyond an investigative

stop's limits is an arrest that probable cause or consent must support to be valid.  See United States

v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the

limits of a Terry stop, however, may be constitutionally justified only by probable cause or

consent.").  "Terry stops must be limited in scope to the justification for the stop . . .  [and] the

intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the

circumstances."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of

demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was

sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"
United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

      The Court also engages in the balancing act of deciding when a detention becomes an
arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub
nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005), the Court determines
whether the police transformed the investigative detention into an arrest by drawing their weapons
on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v.
Perea, 374 F. Supp. 2d at 976.  In that case, the Court determines that such measures are appropriate
and do not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.
The Court recognizes that, "[i]n 'most scenarios,' when officers effectuate what would otherwise
be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which
requires probable cause."  374 F. Supp. 2d at 974 (quoting United States v. Perdue, 8 F.3d at 1463).
See United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other
forceful techniques are justified only by probable cause or when 'the circumstances reasonably
warrant such measures.'")(quoting United States v. Perdue, 8 F.3d at 1462); United States v.
Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v.
Perea that the officers have reasonable suspicion to believe that the suspect might be armed and
dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a
formal arrest requiring probable cause).

      There "exist[s], however, a limited set of circumstances in which officers may draw their
guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with
a stop is permissible where the police reasonably believe the weapons are necessary for their
protection.'"  United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at
1462).  See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding

reasonableness of a stop when officers detain the defendant at gunpoint and place him in handcuffs, where suspect threatens to kill someone and is pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" is not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers do not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspect that the defendant has "just completed a narcotics purchase," there are a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").  United States v. Perea is one of those unique cases, because the police have reasonable cause to believe that the person whom they are detaining is the suspect whom they seek to arrest -- a man wanted for murder who, it is believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirms the Court's determination that the stop is not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a Terry stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety.  United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting Terry v. Ohio, 392 U.S. 1, 20 . . . (1968)).  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else

was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

### 8. **Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.**

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77. Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011, 2011 WL 7444745, at *49 (D.N.M. December 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

## LAW REGARDING THE EXCLUSIONARY RULE

"When the government obtains evidence though an unconstitutional search, the evidence is inadmissible under the exclusionary rule unless an exception applies." United States v. Neugin, 958 F.3d 924, 931 (10th Cir. 2020). See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process."); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). "In addition, a defendant also may suppress any other evidence deemed to be 'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence." United

States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006).  The exclusionary rule applies

if the defendant can show, by a preponderance of the evidence, a constitutional violation under the

Fourth Amendment, and a causal nexus between the violation and the evidence he or she seeks to

excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the

defendant makes this showing, the burden shifts to the United States to prove that an exception to

the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999; United States

v. Ringleb, No. CR 22-0190 JB, 2025 2025 U.S. Dist. LEXIS 75030, at *1-3 (D.N.M. April 18,

2025)(Browning, J.)(holding that police officers violate the Fourth Amendment when they enter a

backyard unlawfully, there is sufficient factual nexus between the unlawful search and the

challenged evidence, and no exclusionary rule exception applies).  The Supreme Court has

recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp.

2d 1201, 1255 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015).

### 1.    Attenuation Doctrine.

One exception to the exclusionary rule is the attenuation doctrine: "Evidence is admissible

when the connection between unconstitutional police conduct and the evidence is remote or has

been interrupted by some intervening circumstance, so that 'the interest protected by the

constitutional guarantee that has been violated would not be served by suppression of the evidence

obtained.'"  Utah v. Strieff, 579 U.S. at 238 (2016)(quoting Hudson v. Michigan, 547 U.S. 586,

593 (2006)).   "The attenuation doctrine evaluates the causal link between the government's

unlawful act and the discovery of evidence."  Utah v. Strieff, 579 U.S. at 238.  To determine

whether there are sufficient intervening acts to break the causal chain between the unlawful stop

and the discovery of evidence, courts examine the three factors that the Supreme Court articulates

in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court concludes that a time span of "less than two hours" between the unconstitutional arrest and the confession is too short an interval, and, therefore, counsels in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court concludes that there are sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applies the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents have probable cause to believe that apartment occupants are dealing cocaine. See 468 U.S. at 799-800. They seek a warrant. See 468 U.S. at 799-800. In the meantime, they enter the apartment, arrest the occupant, and discover evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtain a search warrant. See 468 U.S. at 800-01. The Supreme Court deems the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant is "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggests that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, 579 U.S. at 240 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422

U.S. at 604. See Utah v. Strieff, 579 U.S. at 239 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 579 U.S. at 241. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, 579 U.S. at 241. See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

## 2.    **Good-Faith Exception.**

Recognizing that the exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations," the Supreme Court holds that evidence is admissible where the officer who obtains the evidence through an unlawful search or seizure acts in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011). To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). The Supreme Court explains "that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. 135, 143 (2009))(brackets in United States v. Davis, but not in Herring v. United States). Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot 'pay its way.'" United States v. Davis, 564 U.S. at 238 (internal

quotation marks have no citation).  "In those situations, officers act with an 'objectively reasonable good-faith belief that their conduct is lawful,' . . . precluding the application of the exclusionary remedy."  United States v. Pemberton, 94 F.4th 1130, 1137 (10th Cir. 2024)(quoting United States v. Davis, 564 U.S. at 257).

The good-faith exception most commonly arises in the context of warrant-based searches to allow entry of evidence obtained by officers acting "in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid." Massachusetts v. Sheppard, 468 U.S. 981, 987-88 (1984).  "When a search is conducted pursuant to a warrant that is based on illegally obtained information," however, "a court is not to blindly apply the good-faith exception."  United States v. Alabi, 943 F. Supp. 2d at 1260.  "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed."  United States v. Alabi, 943 F. Supp. 2d at 1260.  If the warrant affidavit's remaining content establishes probable cause, the search pursuant to that warrant is appropriate, and the evidence is admissible:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information.  [United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)]. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid."  United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).  See United States v. Bullcoming, 22 F.4th 883, 890-92 (10th Cir.), cert. denied, 142 S.Ct. 2805 (2022).  "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally."  United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

In United States v. Leon, the Supreme Court concludes that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police are acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23;  id. at 468 U.S. at 905.  The Supreme Court notes that excluding this evidence will not deter police misconduct, as the officer took all of the necessary steps to comply with the Fourth Amendment and reasonably thinks his warrant, and, thus, his search, is valid.  See United States v. Leon, 468 U.S. at 918-19.  The Supreme Court explains that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence will not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  "The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant."    United States v. Martinez,  696  F. Supp. 2d  1216,  1244  (D.N.M. 2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . .  "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."  United States v. Nolan, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.

Furthermore, the Tenth Circuit has explained that, "[u]nder Leon, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth."  [United States v.

Leon, 468 U.S.] at 923 . . . . Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role." Id. Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. (quotation omitted). Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid. See id.

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations

is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d at 1316.

In Herring v. United States, the Supreme Court clarifies that, "[t]o trigger the exclusionary

rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and

sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S.

at 144. Officers arrest Herring pursuant to an arrest warrant listed in the Dale County, Alabama,

warrant database, and discover drugs and a gun on Herring's person during a search incident to

arrest. See 555 U.S. at 137. Herring is then indicted on federal gun- and drug-possession charges.

See 555 U.S. at 138. It turns out, however, that the warrant under which the officers arrested

Herring had been recalled, but the database had not been updated to reflect that recall. See 555

U.S. at 138. Asserting that the evidence found during the search is fruit of an unlawful arrest,

Herring seeks to suppress it. See 555 U.S. at 138.

The Supreme Court concludes that, although the police's failure to update the warrant

database to reflect that Herring's warrant is withdrawn was negligent, the police's omission is not

reckless or deliberate. See 555 U.S. at 140. The Supreme Court reiterates its holding in United

States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the

exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the

subsequently invalidated search warrant." Herring v. United States, 555 U.S. at 142 (quoting

United States v. Leon, 468 U.S. at 922).  The Supreme Court further explains that "'evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional.'"  Herring v. United States, 555 U.S. at 143 (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)).  As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 555 U.S. at 146.

In Davis v. United States, the Supreme Court confronts the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent.  See 564 U.S. at 239.  At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009), which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See Arizona v. Gant, 556 U.S. at 341-48.  The United States Court of Appeals for the Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determines that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explains that "[p]olice practices trigger the harsh sanction of exclusion only when they are

deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144). The Supreme Court states: "The conduct of the officers here was neither of these things. The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement." United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144). The Supreme Court concludes that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case." United States v. Davis, 564 U.S. at 240.

### 3.    Inevitable-Discovery Exception.

Under the inevitable-discovery exception, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means." United States v. Braxton, 61 F.4th 830, 833 (10th Cir. 2023)(quoting United States v. Neugin, 958 F.3d at 931). See United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005). For the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986). The Tenth Circuit clarifies, however, that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question, so long as "the lawful means of discovery are 'independent of the constitutional violation.'" United States v. Christy, 739 F.3d at 540-41 (quoting United States v. Larsen, 127 F.3d 984, 987 (10th Cir. 1997)). The Tenth Circuit has urged courts to consider the "'danger of admitting unlawfully obtained

evidence on the strength of some judge's speculation that it would have been discovered legally anyway.'" United States v. Owens, 782 F.2d at 152-53 (quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)).  Accordingly, "courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation."  United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

The Tenth Circuit further explains that, "[w]hile the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search, the doctrine may apply where, in addition to the existence of probable cause, the police had taken steps in an attempt to obtain a search warrant."  United States v. Souza, 223 F.3d 1197, 1203 (10th Cir. 2000). The Tenth Circuit states that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205.  In United States v. Souza, 223 F.3d 1197, the Tenth Circuit adopts four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

223 F.3d at 1204 (quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)).

See United States v. Cunningham, 413 F.3d at 1204-05 (applying the four factors that United States v. Souza outlines).  In United States v. Christy, the Court applies the four United States v. Souza factors and determines that the inevitable-discovery exception applies.  See United States v. Christy, 810 F. Supp. 2d 1219, 1275-79 (D.N.M. 2011), aff'd, 739 F.3d 534 (10th Cir. 2014)

## ANALYSIS

The Court undertakes its analysis in three sections.  First, the Court denies the Suppression Motion and concludes that the initial warrantless apartment search is lawful, because STIU officers have reasonable suspicion to search the apartment pursuant to Garman's probation search condition.  Second, the Court concludes, in the alternative, that, if the probation search is unlawful, then the Court still denies the Suppression Motion, because law enforcement would have discovered inevitably the challenged evidence, even without the warrantless search's fruits.  Third, the Court concludes that the Apartment Search Warrant and the Car Search Warrant are not defective, because they are based on probable cause and because Judge Baca-Miller is a neutral, detached magistrate.

## I.     THE COURT DENIES THE MOTION TO SUPPRESS, BECAUSE THE INITIAL WARRANTLESS APARTMENT SEARCH IS LAWFUL.

The initial warrantless apartment search is lawful, because STIU officers have reasonable suspicion to search the apartment pursuant to Garman's probation search condition.  To support this conclusion, the Court resolves two issues.  First, the Court concludes that the search condition -- under which probation officers may search Garman's living quarters without a warrant -- applies to Apartment #10 on May 31, 2023, when Garman is on probation for the 856 Case.  Second, the Court concludes that the probation search is lawful, because STIU officers have reasonable suspicion that Garman is committing a crime on May 31, 2023.

### A.     THE SEARCH CONDITION APPLIES TO APARTMENT #10.

The search condition, which allows probation officers to search Garman's living quarters, applies to Apartment #10 for two reasons.  First, Garman is living at Apartment #10 on May 31, 2023.  Second, Garman is on notice that the search condition is one of his probation terms in the 856 Case.

Although law enforcement officers typically must obtain a search warrant that probable cause supports before conducting a search, there are exceptions to this requirement where "'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"    United States v. Carter, 511 F.3d at 1267 (quoting Griffin v. Wisconsin. 483 U.S. at 873).    A probationer who signs a probation agreement that "clearly expressed the search condition" has a "significantly diminished . . . reasonable expectation of privacy."  United States v. Knights, 534 U.S. at 119-20.  This exception, "generally described as a 'special needs search,' holds that 'it is constitutionally reasonable for a parole officer to search parolees in compliance with a parole agreement search provision, but without a warrant.'"  United States v. Mathews, 928 F.3d 968, 975-76 (10th Cir. 2019)(quoting United States v. Freeman, 479 F.3d at 746).  "In the context of a parolee, the exception holds that '[s]upervision . . . is a "special need" of the State . . . [that makes a] warrant requirement impracticable and justif[ies] replacement of the standard of probable cause by "reasonable grounds."'"  United States v. Pacheco, 884 F.3d 1031, 1039 (10th Cir. 2018)(quoting Griffin v. Wisconsin, 483 U.S. at 873-76)(internal quotations have no citations)(brackets in United States v. Pacheco, but not in Griffin v. Wisconsin).

Garman argues that the search condition does not apply to Apartment #10 for two reasons. First, Garman argues that Apartment #10 is not subject to the search condition which permits probation officers to search his residence or living quarters without a warrant, because Garman does not live at Apartment #10.  See Motion to Suppress at 8-10.  Second, Garman argues that he is not subject to the search condition, because Garman is not on notice that he has a search condition in the 856 Case, given that the United States does not introduce a signed probation agreement which lists specifically that condition for the 856 Case.  See Garman Closing Arguments at 9-12.  The Court disagrees with Garman on both issues.

On the first issue, the search condition applies to Apartment #10, because Garman lives there. The Court has concluded, as a finding of fact, that Garman lives at Apartment #10 on May 31, 2023. See supra, FOF No. 43, at 12. The search condition permits probation officers to search Garman's "living quarters" without a warrant. New Mexico Corrections Department, Supervision Conditions & Special Programs: Standard Probation Supervision (undated), available at https://www.cd.nm.gov/divisions/probation-and-parole/ (last accessed June 27, 2025)("Standard Probation Conditions List"); Probation Compliance Forms at 6. Because Garman lives at Apartment #10, the search condition allowing probation officers to search his living quarters applies to that apartment.

On the second issue -- whether Garman is on notice that he has a search condition -- Garman is correct on one point: the Probation Compliance Forms -- which the United States uses to identify the standard search condition -- are not related to the 856 Case, which is the only case for which Garman is on probation on May 31, 2023. See Garman Closing Arguments at 9-12. Garman signs the Probation Compliance Forms on January 22, 2020. See Probation Compliance Forms at 7. Garman's probation in the 856 Case does not begin until October 8, 2020. See 856 Judgment at 1. The Probation Compliance Forms relate to Garman's three other State cases, and Garman is not on probation for any of those three cases on May 31, 2023. See supra, FOF No. at 3, at 4 (concluding, as a finding of fact, that Judge Martinez revokes Garman's probation in the three other State court cases on October 8, 2020).

That the Probation Compliance Forms do not relate to the 856 Case does not persuade the Court, however, that Garman's 856 Case probation terms lack the search condition or that Garman is not on notice that he has a search condition. Garman does not introduce authority stating that probationers are subject to standard probation conditions only when each standard condition is spelled out in a probation agreement. Nor could he present such authority, because the search

condition is a standard probation condition, "which applies in the absence of specific conditions imposed by the court." N.M.S.A. § 31-21-21. See Standard Probation Conditions List (stating that, as a standard probation condition, a probationer agrees to "permit a warrant-less search by the [probation officer] of my person, automobile, residence, property and/or living quarters if he/she has reasonable cause to believe the search will produce evidence of a violation of my conditions of probation"); State v. Lopez, 2007-NMSC-011, ¶ 17, 141 N.M. 293, 298, 154 P.3d 668, 673 & n.1 (affirming district court's probation revocation, where the defendant violates a standard probation condition and citing to the New Mexico Corrections Department's website for a list of standard probation conditions). Moreover, on October 8, 2022, Garman's attorney signs and acknowledges the 856 Judgment, which imposes several special probation conditions "[i]n addition to all standard conditions of probation." 856 Judgement at 4-5. The statement -- "[i]n addition to all standard conditions of probation," 856 Judgment at 4-5 --"clearly expressed," United States v. Knights, 534 U.S. at 119, that Garman is subject to standard probation conditions. Thus, Garman is on notice that he is subject to standard probation conditions.

Garman is also on notice that the standard probation conditions include the search condition. To put a defendant on notice that he is subject to a probation condition, "due process merely requires that the condition be sufficiently clear to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly.'" United States v. Kennedy, 106 F. App'x 688, 691 (10th Cir. 2004)(quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). See United States v. Collins, 461 F. App'x 807, 808 (10th Cir. 2012); United States v. Spencer, 640 F.3d 513, 520 (2d Cir. 2011); United States v. Stanfield, 360 F.3d 1346, 1354 (D.C. Cir. 2004). A condition "violates due process of law if it 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily

guess at its meaning and differ as to its application.'" United States v. Loy, 237 F.3d 251, 262 (3d

Cir. 2001)(quoting Connally v. Gen. Const. Co., 269 U.S. 385, 391 (1926)).

> [T]hough a probationer is entitled to notice of what behavior will result in a
> violation, so that he may guide his actions accordingly, fair warning is not to be
> confused with the fullest, or most pertinacious, warning imaginable.  Conditions of
> probation do not have to be cast in letters six feet high, or to describe every possible
> permutation, or to spell out every last, self-evident detail . . . .  Conditions of
> probation may afford fair warning even if they are not precise to the point of
> pedantry.  In short, conditions of probation can be written -- and must be read -- in
> a commonsense way.

United States v. Gallo, 20 F.3d 7, 12 (1st Cir. 1994)(this Court adds brackets and ellipses).  See

United States v. Munoz, 812 F.3d 809, 818 (10th Cir. 2016)(concluding that a defendant is subject

to a probation condition "involving some measure of flexibility," where "the court could

reasonably assume that Mr. Muñoz would understand what was required").

> Courts generally look to the list of probation conditions to determine
> whether a defendant had adequate notice of proscribed activities.  See, e.g., United
> States v. Grant, 816 F.2d 440, 442 (9th Cir. 1987).  "Of course, where the warning
> is not contained in a formal [probation] condition, the record must be closely
> scrutinized to determine whether the defendant did, in fact, receive the requisite
> warning."  Id. (quotations omitted). In this regard, "the inquiry into fair warning is
> not necessarily confined to the four corners of the probation order."  [United States
> v. ]Gallo, 20 F.3d at 13.  "The meaning of a probation order may be illuminated by
> the judge's statements . . . or other events, any or all of which may . . . aid[ ] the
> court to determine whether a probationer has been forewarned . . . ."  Id.

Leatherwood v. Allbaugh, 861 F.3d 1034, 1045 (10th Cir. 2017)("Leatherwood")(brackets in

Leatherwood, but not in United States v. Grant or in United States v. Gallo).  See United States v.

Abbate, 970 F.3d 601, 605 (5th Cir. 2020)(determining that "a lack of specificity does not

necessarily void the [probation] condition," where "a reasonable person can predict" what the

condition means, and "context provides us the necessary commonsense understanding" of the

condition).

In Leatherwood, Defendant Michael Leatherwood pleads guilty to rape, and an Oklahoma

State judge sentences him to six concurrent 20-year incarceration terms and suspends the sentence

except for ninety days in jail.  See 861 F.3d at 1039.  "Upon completion of his jail time," Leatherwood must serve the remainder of his suspended sentence under probation.  861 F.3d at 1039.  One of his special probation conditions -- Rule 17 -- requires that Leatherwood not "'date, socialize, or enter into a romantic or sexual relationship with any person who has children under the age of eighteen (18) years present in their residence or custody at any time.'" 861 F.3d at 1039 (quoting Leatherwood's probation order).  Before Leatherwood begins his jail term, Oklahoma applies to revoke Leatherwood's suspended sentence, alleging that he violates Rule 17, "based on Mr. Leatherwood's relationship with Regina Wood, the mother of two minor children."  861 F.3d at 1040.  Following the revocation application, Oklahoma authorities put Leatherwood in jail before his revocation hearing.  See 861 F.3d at 1040.  At the revocation hearing, Leatherwood stipulates to the Rule 17 violation, and the State judge "chastised Mr. Leatherwood for refusing to follow the rules, stating, 'And now they put you in jail and you're doing the same thing over there . . . . I gave you all the rope in the world and you hung yourself with it.'"  861 F.3d at 1040 (quoting the record).  Accordingly, the State judge revokes five years of Leatherwood's suspended sentence.  See 861 F.3d at 1040.  Approximately six months later, while Leatherwood is serving his five-year sentence, Oklahoma files a second revocation application, alleging that Leatherwood violates Rule 17 by continuing his relationship with Wood while in prison.  See 861 F.3d at 1040.  At the second revocation hearing, a different State judge revokes the remaining fifteen years of Leatherwood's suspended sentence.  See 861 F.3d at 1040.

Leatherwood applies for habeas relief, alleging that the second revocation violates his procedural due process rights, because he lacked fair warning that Rule 17 applies to his conduct in prison.  See 861 F.3d at 1046-47.  The Tenth Circuit disagrees with Leatherwood:

> The judge told Mr. Leatherwood that he had been "doing the same thing" -- that is, "hav[ing] a relationship with a person who has minor children" -- after "they put [him] in jail" awaiting his revocation hearing.  [Record on Appeal] at 1617.  These

statements clearly informed Mr. Leatherwood that maintaining such a relationship was prohibited even while he was incarcerated.

. . . .

Even if his probation documents did not expressly state that Rule 17 could be enforced while Mr. Leatherwood was in prison, Judge Watson's statements about the impropriety of the relationship and his imposition of the five-year revocation should have put Mr. Leatherwood on notice.  See [United States v. ]Gallo, 20 F.3d at 13; Green[ v. Abrams], 984 F.2d [41,] 46-47 [(2nd Cir. 1993)]. Yet Mr. Leatherwood continued the relationship with Ms. Wood after he was sent to prison, and he admitted at his second revocation hearing that he knew about and was responsible for violating Rule 17 while in prison.  The 15-year revocation did not violate his due process right to fair warning.

Leatherwood, 861 F.3d at 1047-48.

Although Judge Martinez does not tell Garman, like Judge Watson tells Leatherwood, about the probation conditions' scope, Leatherwood guides the Court to consider record evidence outside of the 856 probation terms to determine whether Garman is on notice that he has a search condition.  See Leatherwood, 861 F.3d at 1047-48.  A repeat defendant, like Garman, who acknowledges a probation condition's scope is on notice about that condition's scope, even if his probation order does not spell it out.  See Leatherwood, 861 F.3d at 1047-48; United States v. Collins, 461 F. App'x at 808 (concluding that a defendant is on notice that a condition applies to him, even though the district court's most recent judgment does not list the condition, because the judgment "incorporated by reference" the previously imposed condition).  Considering the record, the Court concludes that Garman is on notice for two reasons.  First, Garman acknowledges that the search condition is a standard condition when he signs the Probation Compliance Forms in his other three State cases.  See Probation Compliance Forms at 6-7.  Those forms list and describe New Mexico's standard conditions and state clearly that the search condition is a "standard condition."  Probation Compliance Forms at 6.  By signing the Probation Compliance Forms, Garman acknowledges that the search condition is a standard condition.  See Leatherwood, 861 F.3d at 1047-48.  When Garman begins his 856 probation term a short nine months later, he is still

on notice that the search condition is a standard condition. See Leatherwood, 861 F.3d at 1047-

48. Because the 856 Judgment tells Garman that he has standard conditions, see supra, FOF No. 9,

at 6, Garman is also on notice that his 856 Case has the standard search condition.

Second, Garman acknowledges that the standard probation conditions, including the search

condition, apply to him in the 856 Case when he complies with his other standard probation

conditions. Namely, Garman meets with his probation officer -- Grogan -- several times between

December, 2021, and March, 2022, and he tells her that he is living at Albuquerque Opportunity

Center. See FOF No. _, at _. One of New Mexico's standard probation conditions requires a

probationer to report to his probation officer. See Probation Compliance Forms at 6; Standard

Probation Conditions List. That he follows one of those conditions and meets with Grogan

demonstrates that Garman knows about his standard probation conditions. Thus, Garman is on

notice that he has a standard search condition. In sum, the Court concludes that the standard search

condition, which allows probation officers to search Garman's living quarters without a warrant,

applies to Apartment #10, because: (i) Garman lives there; and (ii) Garman is on notice that his

856 Case has a standard search condition.[6]

---

[6]The Court evaluates the notice issue under federal law, because whether Garman is on notice is a Constitutional question. See United States v. Kennedy, 106 F. App'x at 691. The Court notes, however, that, even under New Mexico law, Garman is on notice that he is subject to the standard search condition. New Mexico courts have determined that defendants have notice of probation conditions and consequences when they have a history of criminal conduct or when a prior probation violation clarifies a probation condition's scope. See State v. Villalobos, 1998-NMSC-036, ¶ 11, 126 N.M. 255, 257-58, 968 P.2d 766, 768-69 (concluding that the defendant, "particularly as a habitual offender, was on notice of the consequence of violating probation"); State v. Dinapoli, 2015-NMCA-066, ¶ 24, 350 P.3d 1259, 1265 (concluding that a sex-offender defendant is on notice that a probation condition prohibiting him from viewing sexually oriented or sexually stimulating material is not limited to pornography, because the "circumstances of [an earlier probation] violation were sufficient to provide a reasonable person with notice that possession of sexually oriented or sexually stimulating material was forbidden by the sex offender contract even if it were not considered pornographic," where the earlier violation was based on the defendant viewing "websites on his cell phone that included statements of people who were raped").

### B.    THE PROBATION SEARCH IS LAWFUL.

The probation search is lawful, because STIU officers have reasonable suspicion that Garman is committing a crime on May 31, 2023.  "A probation search [is] permissible so long as supported by reasonable suspicion, regardless of the motivation for the search."  United States v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002).  See United States v. Teston, No. CR 22-1400 JB, 2023 WL 5567356, at *1 (D.N.M. Aug. 28, 2023)(Browning, J.)(holding that a probation search is lawful, because the probation officer has reasonable suspicion to search the defendant's truck, where: (i) the officer sees, in plain view, a carbon dioxide canister, suggesting the presence of firearms; (ii) the defendant is unable to produce a drug test saliva sample for twenty minutes, suggesting drug use; and (iii) the defendant's subsequent urine analysis test produced an inconclusive result for methamphetamine and a positive result for marijuana).  Reasonable suspicion is "['] merely a particularized and objective basis for suspecting criminal activity.'"  United States v. Freeman, 479 F.3d at 748 (quoting United States v. Tucker, 305 F.3d at 1200).  While reasonable suspicion requires "'some minimal level of objective justification,'" it requires less justification than is required to show probable cause.  United States v. Freeman, 479 F.3d at 749-50 (quoting INS v. Delgado, 466 U.S. 210, 217 (1984), and citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).  In assessing whether reasonable suspicion exists for a search, courts "consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances."  United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).

When the STIU officers conduct the probation search, they have reasonable suspicion that Garman is committing a crime.  The probation search begins when the STIU officers clear the

apartment after detaining Garman and Garcia.[7]  See, supra, FOF Nos. 32-35, at 10-11.  At this

point,[8] the STIU officers have incriminating information.  First, Bonsemeyer's informant tells

---

[7]That the STIU officers describe the initial apartment search as a "safety sweep," March 17, 2025, Tr. at 23:22 (Giacci), does not change the Court's conclusion that this initial "clearing the apartment," March 6, 2025, Tr. at 65:23 (Bonsemeyer) is a probation search, rather than a protective sweep.  "A protective sweep is not a full search, but rather a quick, cursory inspection of the premises, permitted when police officers reasonably believe, based on specific and articulable facts, that the area to be swept harbors an individual posing danger to those on the arrest scene."  United States v. Soria, 959 F.2d 855, 857 (10th Cir. 1992).  Protective sweeps are permitted in two situations: (i) "authorities can look in 'closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched'"; and (ii) "authorities can look elsewhere in the house upon specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house."  United States v. Bagley, 877 F.3d 1151, 1153 (10th Cir. 2017)(quoting Maryland v. Buie, 494 U.S. 325, 334 (1990)).  In the first situation, "the requirement that the spaces be immediately adjoining is literal."  United States v. Colbert, No. CR 21-1221 JB, 2023 WL 5672694, at *31 (D.N.M. Sept. 1, 2023)(Browning, J.).  See United States v. Bagley, 877 F.3d at 1155 (concluding that, without information about "the length of the hallway or the distance between Mr. Bagley and the southeast bedroom," it could not determine whether Bagley's location was "adjacent" to the southeast bedroom when officers arrested him, even though the officers may have arrested him inside the home).  In the second situation, the officers "must point to specific, articulable facts that: (i) there is a structure near the arrest scene which may harbor a third individual; and (ii) the third individual presents a danger to the officers."  United States v. Colbert, No. CR 21-1221 JB, 2023 WL 5672694, at *32.  The STIU officers' "safety sweep" goes beyond "closets and other spaces immediately adjoining the place of arrest," Maryland v. Buie, 494 U.S. at 334, and the STIU officers do not have "specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house," United States v. Bagley, 877 F.3d at 1153.  See supra, FOF No. 30, at 10 (citing March 17, 2025, Tr. at 39:15-18 (Giacci)(testifying that, when he enters the apartment, he does not have any information about anyone besides Garman and Garcia entering or leaving the apartment)).  Thus, the Court concludes that, when the STIU officers clear the apartment, they are not conducting a valid protective sweep.  Keeping in mind that "[a] probation search [is] permissible so long as supported by reasonable suspicion, regardless of the motivation for the search," the Court concludes, however, that the initial sweep is a probation search, even if the STIU conducts that search for safety reasons.  United States v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002).

[8]Garman argues that the Court should evaluate whether the officers have reasonable suspicion based on the information available to law enforcement officers before they enter the apartment rather than after they arrest him, because the STIU officers "had no legitimate reason to enter the apartment."  Garman Closing Arguments at 12-15.  The Court disagrees with Garman.  "[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  Payton v. New York, 445 U.S. 573, 603 (1980).  See United States v. Hutchinson, 573 F.3d 1011, 1023 (10th Cir. 2009)(holding that "law enforcement officers may enter a home to execute an arrest warrant only when the officers have a reasonable belief that (1) the arrestee lives in the residence and (2) the arrestee is in the residence at the time of entry.").  When they enter the

Bonsemeyer that Garman is likely armed and has been doing drugs.  See supra, FOF No. 20, at 7-8.  Second, Rhoades sees Garman try to escape out of the apartment's window when Bonsemeyer tells Garman that he is there to arrest him.  See supra, FOF No. 28, at 9 & n.3.  Third, when Giacci enters Apartment #10 to arrest Garman, Giacci observes, in plain view, drug paraphernalia in the living room.  Supra, FOF No. 31, at 10.  Considering "the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances," these facts constitute reasonable suspicion.  United States v. Freeman, 479 F.3d at 749.  See United States v. Carter, 511 F.3d at 1269 (concluding that a probation officer has reasonable suspicion to search the defendant's residence based on a tip from a social worker that the defendant is planning to change residences in violation of his probation's terms, is "associating with people using illegal substances," and refuses to take a drug test); March 6, 2025, Tr. at 51:22-52:20 (Bonsemeyer)(testifying that he "received very reliable information from different sources" that Garman is living at 1200 Louisiana Blvd NE, Albuquerque, using drugs, and is "most likely armed" with a firearm).  Although it is possible that the drug paraphernalia is not Garman's, the Court "'need not rule out the possibility of innocent conduct,' . . . and reasonable suspicion may exist 'even if it is more likely than not that the individual is not involved in any illegality.'"  United States v. McHugh, 639 F.3d 1250, 1256 (10th Cir. 2011)(quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)).  Here, the drug paraphernalia corroborates the confidential informant's tip about Garman's drug use, and, thus, the STIU officers have "a particularized and objective basis

---

apartment, STIU officers have a "reasonable belief," United States v. Hutchinson, 573 F.3d at 1023, that Garman lives there and is inside, because STIU officers watch Garman enter the apartment, see supra, FOF No. 23, at 8, which corroborates Bonsemeyer's "very reliable" tip that Garman is living there, March 6, 2025, Tr. at 51:22-24 (Bonsemeyer).  Accordingly, the Court concludes that the STIU officers' entry into the apartment to arrest Garman is lawful.  Because the STIU officers are inside the apartment lawfully, all the information they have when they arrest Garman -- before clearing the apartment -- go into the reasonable suspicion inquiry.

for suspecting" that Garman has been using illegal drugs.  United States v. Freeman, 479 F.3d at

748.  Accordingly, the Court concludes that the probation search of Apartment #10 is lawful.

## II.    EVEN IF THE INITIAL WARRANTLESS PROBATION SEARCH IS UNLAWFUL, THE COURT DENIES THE SUPPRESSION MOTION.

Even if the initial warrantless probation search is unlawful, the Court denies the Motion to

Suppress, because law enforcement would have discovered inevitably the challenged evidence.

The question here is whether the STIU officers would have discovered inevitably the challenged

evidence if, after arresting Garman, they did not conduct the probation search.  Under the

inevitable-discovery exception, the exclusionary rule does not apply if the government can prove

by a preponderance that "the evidence inevitably would have been discovered by lawful means."

United States v. Braxton, 61 F.4th at 833 (quoting United States v. Neugin, 958 F.3d at 931).  "The

government possesses the burden of proving by a preponderance of the evidence that the evidence

at issue would have been discovered without the Fourth Amendment violation."  United States v.

Cunningham, 413 F.3d at 1203.  For the inevitable-discovery exception to apply, there must be a

"lawful police investigation [that] inevitably would have discovered" the evidence in question.

United States v. Owens, 782 F.2d at 152.  See 6 LaFave, supra § 11.4(a), at 371-72 (stating that

"[c]ircumstances justifying application of the 'inevitable discovery' rule are most likely to be

present if these investigative procedures were already in progress prior to the discovery via illegal

means," or "where the circumstances are such that, pursuant to some standardized procedures or

established routine a certain evidence-revealing event would definitely have occurred

later")(internal quotations have no citation).  The Tenth Circuit clarifies, however, that the

inevitable-discovery exception does not require a second, independent investigation that would

have discovered the evidence in question, so long as "the lawful means of discovery are

'independent of the constitutional violation.'"  United States v. Christy, 739 F.3d at 540-41

(quoting United States v. Larsen, 127 F.3d at 987).  The inevitable discovery exception also may

apply where, "even though no steps to obtain a warrant had been initiated at the time of the search," the officer "would have successfully obtained a warrant independent of the illegal search." United States v. Christy, 739 F.3d at 543. To determine whether an officer would have obtained a warrant successfully, courts in the Tenth Circuit evaluate four factors, also known as the Souza factors:

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (quoting United States v. Cabassa, 62 F.3d at 473-74 & n.2).

Applying the Souza factors, the Court concludes that the inevitable discovery exception applies, even if the probation search is unlawful. The first Souza factor -- the extent to which the warrant process has been complete -- weighs against applying the inevitable-discovery exception, because the STIU officers do not take any steps to obtain a warrant before they conduct the probation search. The second factor -- the strength of the probable cause showing at the time the search occurred --weighs strongly in favor of applying the inevitable discovery exception, because STIU officers have enough information before conducting the probation search to support probable cause. At that moment, the STIU officers have incriminating information: (i) Bonsemeyer's reliable informant tells him that Garman lives in Apartment #10, is doing drugs with Garcia, and likely is armed; (ii) STIU officers see Garman go into Apartment #10; (iii) Rhoades sees Garman try to escape from Apartment #10 after Bonsemeyer announces his presence and tells Garman that he is under arrest; (iv) STIU officers find Garman in Apartment #10; and (v) Giacci sees drug paraphernalia in the living room. See FOF Nos. X-XX, at _. These facts are "sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d at 1006. See United States v. Mercado, 307 F.3d 1226, 1228

(10th Cir. 2002)(concluding that a police officer has probable cause to search a vehicle, because (i) he notices the car has an altered ceiling, which is evidence of a hidden compartment; (ii) the defendant cannot "articulate where or for whom he worked"; and (iii) the defendant insists on having his car towed, even though he knows it is less expensive to have it repaired); United States v. Quintana-Pena, No. CR 20-1627 JB, 2024 WL 4007934, at *33 (D.N.M. Aug. 30, 2024)(Browning, J.)(concluding that police officers have probable cause to search a vehicle, because "they observed what they knew to be heroin in plain view").  The third Souza factor -- whether a warrant is obtained ultimately -- also weighs in favor of applying the exception, because the STIU officers obtain a search warrant shortly after conducting the probation search.  The fourth factor -- whether the officers jump the gun, because they lack confidence in their ability to get a warrant -- also weighs in favor of applying the exception, because there is no evidence that the STIU officers are worried that they cannot get a warrant before they conduct the probation search. With three Souza factors weighing in favor of applying the inevitable-discovery exception, the Court concludes that the STIU officers would have discovered inevitably the challenged evidence, even if they did not conduct the probation search.

## III.    THE SEARCH WARRANTS ARE VALID.

The Apartment Search Warrant and the Car Search Warrant are valid, because they are based on probable cause, and because Judge Baca-Miller is a neutral, detached magistrate.  As discussed, the probation search is lawful.  See supra, at 65-69.  Because the probation search is lawful, the Apartment Search Warrant is not necessary.  The Court considers Garman's arguments about the warrants, however, in the alternative.  First, the Court concludes that probable cause supports the Apartment Search Warrant and the Car Search Warrant.  Second, the Court concludes that Judge Baca-Miller is a neutral, detached magistrate.

Garman argues that the Apartment Search Warrant and the Car Search Warrant are not valid, because, according to Garman, without the allegedly unlawfully obtained information -- i.e., the information STIU officers obtain during the probation search -- the warrants do not have probable cause.  See Garman Closing Arguments at 16-18.  The Court disagrees with Garman. Probable cause supports the Apartment Search Warrant and the Car Search Warrant, with or without the probation search's fruits.  As discussed, the probation search is lawful.  See supra, at 65-69.  Thus, contrary to Garman's assertions, the supporting affidavits properly include the probation search's fruits.  Accordingly, probable cause supports the Apartment Search Warrant and the Car Search Warrant, because their supporting affidavits are "sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d at 1006.  Both supporting affidavits describe how law enforcement officers discover eleven firearms, approximately 3,000 fentanyl pills, and large cash amounts during the probation search.  See Apartment Search Warrant at 3-4; Car Search Warrant at 4. These facts establish probable cause.  See United States v. Sanchez, 555 F.3d 910, 913 (10th Cir. 2009)(concluding that an affidavit supports probable cause to search a home where the affiant says that he observes the resident return to that home several times after conducting drug transactions); United States v. Quintana-Pena, 2024 WL 4007934, at *33.  Turning to Garman's argument, the Court concludes that, even if the probation search is unlawful -- which it is not -- the warrants are valid, because, after removing the probation search's allegedly unlawful fruits, the supporting affidavits still establish probable cause.  See United States v. Bullcoming, 22 F.4th 883, 890 (10th Cir. 2022)(affirming denial of a suppression motion and concluding that a warrant is valid, because the warrant contains sufficient evidence "to support probable cause even without the information from [the] challenged searches"); United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005)("When a warrant is tainted by some unconstitutionally obtained information, we

nonetheless uphold the warrant if there was probable cause absent that information."); supra, at 70-71 (concluding that the STIU officers have probable cause to search the apartment before they conduct the probation search). Accordingly, the Court concludes that probable cause supports the Apartment Search Warrant and the Car Search Warrant.

Garman also argues that Judge Baca-Miller is not a neutral, detached magistrate, because she previously represented him in an unrelated matter. See Garman Closing Arguments at 16-18, The Court disagrees with Garman, because Judge Baca-Miller's earlier representation of Garman does not demonstrate that she bases her decision on anything other than the facts presented to her in the Apartment Search Warrant.[9] "To safeguard rights protected by the Fourth Amendment, 'it is essential that a magistrate issuing a search warrant be neutral and detached.'" United States v. Guthrie, 184 F. App'x 804, 806 (10th Cir. 2006)(quoting United States v. Ramirez, 63 F.3d 937, 941 (10th Cir. 1995)). "[A] search premised on a warrant issued by a magistrate who lacks such neutrality and detachment 'stands on no firmer ground than if there had been no warrant at all.'" United States v. Ramirez, 63 F.3d at 941 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 453 (1971)). "Whether a magistrate was neutral and detached in any particular case is necessarily an individualized and contextual inquiry," and a court must "focus on the specific circumstances surrounding the issuance of the warrant and decide whether the magistrate 'manifest[ed] that neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure.'" United States v. Ramirez, 63 F.3d at 941 (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 325 (1979)). Judge Baca-Miller is neutral and detached, because "there is no evidence to suggest that [she] based [her] decision on anything other than the facts presented in the" Apartment Search Warrant's supporting affidavit. United States v. Guthrie,

---

[9]Judge Baca-Miller signs only the Apartment Search Warrant. See FOF No. _, at _. Thus, Garman's arguments about Judge Baca-Miller's neutrality apply only to the Apartment Search Warrant.

184 F. App'x at 808 (this District Court adds brackets).  In United States v. Guthrie, the Tenth Circuit concludes that a magistrate judge is impartial, even though the magistrate judge previously represented the defendant.  See United States v. Guthrie, 184 F. App'x at 808.  The Tenth Circuit bases its conclusion on two facts: (i) the previous representation was "in a wholly unrelated matter," and (ii) the supporting affidavit "was overwhelmingly sufficient to establish probable cause."  United States v. Guthrie, 184 F. App'x at 808.  Similarly, here: (i) Garman does not allege that Judge Baca-Miller's previous representation is connected to the 856 Case; and (ii) the Apartment Search Warrant's supporting affidavit is "overwhelmingly sufficient to establish probable cause."  United States v. Guthrie, 184 F. App'x at 808.  Thus, Judge Baca-Miller is neutral and detached.  Accordingly, the Court concludes that the Apartment Search Warrant and the Car Search Warrant are valid, because the supporting affidavits establish probable cause, and Judge Baca-Miller is neutral and detached.

IT IS ORDERED that the Defendant's Motion to Suppress, filed December 16, 2024 (Doc. 49), is denied.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
  United States Attorney
Jaymie L. Roybal
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Joel R. Meyers
Law Office of Joel R. Meyers
Santa Fe, New Mexico

*Attorney for the Defendant*